Filed 8/7/23  Cynthia L. v. Superior Court CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CYNTHIA L.,<br><br>　　　Petitioner,<br><br>　　　v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>　　　Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>　　　Real Parties in Interest. | B326613<br><br>Los Angeles County Super. Ct. No. 20CCJP05696A |

　　　ORIGINAL PROCEEDINGS in mandate. Charles Q. Clay III, Judge. Petition denied.

　　　Law Offices of Vincent W. Davis & Associates and Vincent W. Davis for Petitioner.

　　　No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Real Party in Interest Los Angeles County Department of Children and Family Services.

Children's Law Center and Michael Ono for Real Party in Interest Y.L., a Minor.

## INTRODUCTION

In this juvenile dependency matter, Cynthia L. (mother) seeks extraordinary writ relief from the court's order terminating her family reunification services and setting a hearing pursuant to Welfare and Institutions Code section 366.26[1] to consider the implementation of a permanent plan of adoption for her son, Y.L. (the minor). Mother argues no substantial evidence supports the court's finding that returning the minor to her custody would be detrimental to his health and well-being. We conclude the record amply supports the court's conclusion. Mother further argues the Department of Children and Family Services (Department) failed to provide reasonable reunification services during the 12- to 18-month review period and that such failure requires the reversal of the challenged order. The Supreme Court, however, recently held otherwise. (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 634 (*Michael G.*).) Finally, mother argues the court erred in finding that the beneficial parent-child relationship exception to adoption does not apply. The court has not yet considered that question and therefore the issue is not yet ripe for review.

---

[1] Section references are to the Welfare and Institutions Code unless otherwise specified.

2

## FACTS AND PROCEDURAL BACKGROUND

### 1. Petition (§ 300)

Mother and the minor most recently came to the attention of the San Mateo County Department of Children and Family Services (Agency) in late July 2019 due to concerns about mother's untreated mental health conditions and the minor's isolation. Specifically, the minor, who was then eight years old, had never been enrolled in school and mother had only taught the minor about the Bible. Although mother lived with other family members, she kept the minor isolated from them and from other children. Mother kept the minor locked in a room and did not allow him to talk to anyone. He was not allowed to watch television, play with toys, or read books because mother believed "they are the devil." When other family members were on vacation, mother threw away all their clothes, shoes, valuables, children's toys, and the television "because the devil was in the label of the items."

On August 6, 2019, after a referring party advised that mother was a flight risk, the Agency filed a petition under section 300, subdivision (c), alleging generally that mother had refused treatment for mental illness and as a result had obstructed the emotional and social development of the minor and subjected him to various forms of emotional abuse. At the detention hearing, the court ordered that the minor remain in mother's care on the condition that mother complete a psychological evaluation, allow unannounced home visits, involve the minor in mental health services and youth groups, and keep the Agency apprised of the family's address at all times.

On August 30, 2019, the minor was detained from mother after she moved to a shelter without advising the Agency.

3

## 2.     Jurisdiction and Disposition

By April 2020, the Agency had filed a third amended petition including allegations under section 300, subdivisions (b)(1) and (c). After a contested adjudication and disposition hearing, the court sustained the following jurisdictional allegation under section 300, subdivision (b)(1):

"On August 6, 2019, a petition was filed on behalf of [the] eight-year-old [minor], due to concerns about the mother's untreated mental health which resulted in [the minor] being isolated from age appropriate educational, familial, and social interactions. The minor has never been enrolled in public school and was not in compliance with California's home school education requirements and as a result he was not at grade level when eventually enrolled in public school after removal from the mother. Further, [the minor] does not have any friends of his age group. When asked who his friends were, [the minor] reported that spiders and inanimate objects were his friends.

"[The minor] also reported that God also prevents him from playing with other children and that he is only allowed to read about how God will return to Earth. The mother was previously psychiatrically hospitalized on October 3, 2015, and diagnosed with Psychosis, not otherwise specified. However, she denies having mental health issues, and has not engaged in treatment for several years. On August 7, 2019, the San Mateo County Juvenile Court allowed [the minor] to remain in mother's care, on the condition that the mother complete a psychological evaluation, allow unannounced home visits, involve [the minor] in mental health services and youth groups, and that mother keep the Agency apprised of her residence address at all times. On August 17, 2019, the family left their residence without prior

4

notice and could not be located. The Court issued a Protective Custody Warrant which was executed on August 27, 2019, when the Agency located the family at a shelter. [The minor] is at substantial risk of suffering serious physical harm or illness as a result of the mother's inability to provide care due to mental illness."

The court sustained a nearly identical allegation under section 300, subdivision (c). The only difference is the final sentence, which reads: "[The minor] is suffering, or is at substantial risk of suffering, serious emotional damage as a result of the mother's conduct."

The court ordered the minor returned to mother's custody with family maintenance services and ordered mother to participate in a parenting program, individual counseling, and a psychological evaluation. Mother did not engage in any of the offered services, however. Additionally, during the minor's foster placement, he had received tutoring services to support his education. During that time, the minor made substantial academic progress, gaining confidence and showing excitement about academics. That progress ceased when the minor returned to mother's care because he missed or mother canceled most tutoring appointments.

In a status review report filed in October 2020, the Agency noted that the minor had been enrolled in an elementary school in Los Angeles[2] but was not attending school via distanced

---

[2] The family relocated to Los Angeles County in August 2020. The dependency matter was transferred to Los Angeles County in October 2020.

learning.[3] Mother had disenrolled the minor from school in September 2020, opting to homeschool him instead. Mother also continued to resist court-ordered services and stated that she would not participate in court-ordered mental health services through any non-Christian organization.

### 3.  Supplemental Petition (§ 387)

In June 2021, the Department filed a supplemental petition under section 387 and the court detained the minor from mother. The petition contained the following allegation: "[Mother] continues to exhibit mental and emotional problems including paranoid behavior and continues to deny the need for mental health therapy. The mother does not show any insight to her mental health needs and is continuously resistant to participate in mental health services and continues to isolate the child from age appropriate socialization. The mother's mental and emotional problems endanger the child's physical health and safety and place the child at risk of serious physical harm, damage and danger."

The Department had made repeated efforts to provide mental health evaluations and services, if appropriate, to the minor and mother but met with mother's refusal at every turn. Mother denied having any mental health concerns, her 2015 diagnosis of psychosis notwithstanding. The Department requested that the court order intensive individual therapy, parenting classes, and additional case management services for mother. As for the minor, the Department concluded that he had

---

[3] During this timeframe, many schools in Los Angeles County conducted classes online due to the Covid-19 pandemic.

not been receiving adequate education and continued to be isolated from children his own age. Due to mother's continued denial of mental health issues and resistance to participating in court-ordered services, the Department recommended removing the minor from mother.

In a last minute information, the Department described a recent monitored visit at a park between mother and the minor. The maternal grandmother also attended the visit. The visit was initially monitored by the minor's foster mother. She became concerned, however, when mother and the maternal grandmother repeatedly took the minor some distance away from her and they were whispering to him. The minor then stated that the foster mother had called him "cabron" ("dumbass"), which she denied. The foster mother contacted the Department social worker, who subsequently arrived at the park to find officers from the Los Angeles Police Department on the scene and the family screaming and crying. The minor was extremely upset and was disrespecting the foster mother. Mother began begging the social worker to return the minor to her care. In the midst of this scene, the maternal grandmother grabbed the minor and whispered in his ear, cupping her hand so she could not be heard.

The social worker took the minor back to the Department's nearby office. The minor was clearly upset and said he overheard the foster parent use the word "cabron" and that "[i]t emotionally abused me and I am traumatized." After some time, the minor was calm enough to return to the foster mother's home. The social worker facilitated a discussion about the incident and recommended that future visits between mother and the minor occur in a therapeutic setting to ensure the minor's well-being.

At a hearing on June 18, 2021, the court found the Department had established a prima facie case as to the allegation in the supplemental petition, ordered the minor detained from mother, and further ordered monitored visitation with discretion to liberalize.

**4.    Jurisdiction and Disposition (§ 387)**

In its report on jurisdiction and disposition for the supplemental petition, the Department noted that mother said she had been homeschooling the minor because he had been bullied at school. She also stated that she saw a picture of a witch in one of the minor's schoolbooks and felt that was "psychological abuse" to the minor. Mother elaborated, saying the witch was satanic and that it would lead to teaching about "sex and perverted things like condoms." The social worker who spoke with the minor, however, was concerned about his apparent lack of learning. When asked what he had learned recently, the minor said "300 makes 300 and 600 makes 600." He could not elaborate. In addition, the minor could not identify any friends.

Mother had begun seeing a therapist, but the therapist reported that mother was not participating in "therapy," per se. Instead, the sessions focused on the Department's recommendations. The therapist expressed concern over mother's excessive emails (20 at a time when mother had something on her mind) and recommended a psychiatric evaluation. The therapist had obtained a psychiatric evaluation of mother from 2019, which reflected a history of severe depression, including psychotic symptoms such as hallucinations and delusional thoughts. The report stated "[a]t this time, her ultra-religious beliefs do not seem psychotic in nature, albeit very fanatical." The Department

8

requested that the court order a psychiatric evaluation for mother.

The foster mother reported that the minor had very limited social skills and would generally not play outside or interact with the other children in the house for an extended period. The minor had started to see a therapist on a weekly basis. The therapist diagnosed the minor with an anxiety disorder and noted that he was triggered by speaking with mother. The therapist spoke briefly with mother and described her this way: "[S]he was in distress regarding being accused of abusing her son. The mother is engaged in religion and she stated that school and interactions were limited because the devil was involved."

In mid-August 2021, a last minute information for the court described another visitation incident. A Department social worker was monitoring the visit at a park and mother took the minor to her car to retrieve something. When they returned, mother said the minor had told her that the foster mother was mistreating him. The minor denied any mistreatment, but mother began to cry and scream, pleading with the social worker to remove the minor from the abusive foster home. As mother cried louder, the minor became upset and also began to cry and scream. Mother turned to him and yelled, "[t]ell me what she does to you, tell me how she mistreats you." The minor froze. At that point, the social worker intervened and took the minor to her car to talk. Mother got on her knees, cried even louder, and begged the social worker to remove the minor from the foster home "because he is being psychologically abuse[d] every day." By the time the social worker got the minor away from the scene, he was hyperventilating. When he calmed down, he said he was not

being mistreated by the foster family and did not want to be moved from the home.

Several days later, the foster mother contacted the social worker to report that the minor's behavior had gotten worse, that he had regressed and was no longer listening or following directions. He was also soiling himself and said he did not notice when he "poops on himself." He also began urinating more frequently while sleeping and would hide the soiled clothing. The foster mother observed that the minor was not doing well after his last visit with mother and that her visits had a negative impact on the minor when she became upset. The social worker recommended that future visits be monitored by a therapist.

In late August 2021, the court adjudicated the section 387 petition and sustained the supplemental allegation. The court further found as to disposition that clear and convincing evidence presented by the Department required the minor's removal from mother. The court ordered that the minor remain in suitable placement, receive individual counseling, and have a psychiatric evaluation to address ongoing enuresis and encopresis. Further, the court ordered the Department to continue to provide family reunification services to mother, with monitored visitation a minimum of twice a week for two hours per visit. The court advised, however, that the monitor should be made aware of mother's mental health issues and that her visits with the minor would stop if she acted inappropriately. Mother's case plan included individual counseling to address case issues, parenting, depression, dysfunctional beliefs, and childhood trauma.

5.  **Six-month Status Review**

During the next period of supervision, the Department reported that mother continued to accuse the foster mother of

abusing the minor. The minor and the foster mother continually denied any sort of mistreatment. Mother's therapist reported that mother was difficult to work with as she did not accept responsibility for her actions. During sessions, mother avoided speaking about herself and instead spoke about the Bible. The Department expressed concern that although mother was participating in court-ordered services, she was not addressing case issues and therefore was not making progress toward reunification. Mother denied that her behaviors and decisions negatively impacted the minor and instead blamed the Department or his school. The Department recommended continuing family reunification services for mother with the minor remaining in suitable placement.

The court conducted a six-month review hearing regarding the section 387 petition in February 2022. The court concluded that mother's compliance with the case plan was partial, ordered that the minor remain in suitable placement, and continued mother's family reunification services for reasons stated on the record in open court.[4]

**6.      12-month Status Review**

During the following period of supervision, the minor remained in his foster placement. The minor said he felt safe and comfortable with everyone in the house and described the caregivers as "caring and supportive." The minor reported that he had experienced "tremendous growth" in that he was learning to communicate better, being more social, and expressing his feelings.

---

[4] No transcript of this hearing is included in the appellate record.

On May 3, 2022, however, mother went to the minor's school and demanded that the administrative staff stop other students from bullying the minor. They responded that the minor had not reported any bullying. The following day, the minor told the foster mother that he had been thinking about the word "suicide" all day during school. The foster mother alerted the Department. An emergency team was dispatched and concluded the minor "seemed to be doing well and did not need services." The next day, the minor's school administrators called the foster mother to report that the minor was in crisis. He had had a panic attack, said he was thinking of suicide, and was now thinking of a plan. The following weekend, the minor had several toileting accidents. In late May and early June, the minor began crying during his virtual visits with mother but could not explain why. The minor's new therapist did not recommend conjoint therapy in June, as she was just beginning to build rapport with him.

Mother completed a parenting course but, according to the Department, was not applying the concepts she had learned. Most of the visits between mother and the minor involved the minor doing his homework on his own and mother grooming the minor (e.g., clipping his nails or cleaning his shoes.) Mother also reacted to reports of the minor's misbehavior—pulling down his pants in front of other children, for example—by saying everything was okay. The Department noted that mother had difficulty disciplining the minor as well as engaging with him. In general, the Department was concerned that mother had made little progress on case issues, and it recommended continuing family reunification services for another six months.

Also, at some point, the Department learned that in April 2022, mother had kept three children away from their

biological mother for six days. Limited detail is provided in the appellate record. It appears mother believed that the biological mother had neglected and abused the children and reported such to the Child Protection Hotline. Mother claimed that the children were left with her by their father and were only with her for a weekend. Mother denied any misconduct and insisted she was simply doing a favor for a friend. The biological mother, however, contacted law enforcement to regain custody of the children. Even after the children were returned to their home, mother continued to try to have contact with them, despite being told not to do so.

In a last minute information for the court, the Department reported that mother had again disenrolled the minor from school. The minor had been scheduled to attend a three-day orientation at his new middle school designed to assist new students with the transition. When the foster mother and the minor arrived at school for the orientation, they were told that mother had disenrolled the minor. Mother denied doing so, but the school staff identified her as the person who removed the minor from the school.

The court conducted the 12-month review hearing in mid-August 2022. The court concluded that mother's progress was substantial and ordered reunification services continued for an additional six months for reasons stated on the record in open court.[5]

## 7.    18-month Hearing and Order

In preparation for the 18-month review hearing, the Department reported that the minor remained in his original

---

[5] No transcript of this hearing is included in the appellate record.

13

foster placement and showed significant growth in his learning and social capacities. He had also obtained basic hygiene skills, often completed chores at home, and gained self-confidence. The minor was attending the sixth grade at a nearby public school and reported enjoying school. He had been staying after school where he received homework assistance and played with friends. He continued to display disruptive behavior at home and at school, however.

Mother and the minor had had several conjoint therapy sessions. The sessions stopped after mother attempted to subpoena the therapist in an attempt to create a case against the minor's foster mother. Mother's individual therapist reported that mother had attended weekly sessions but still denied that anything was wrong and that she had any case issues to be addressed in therapy.

The minor told a Department social worker that although he missed mother, he was not ready to reunify with her. Specifically, he said that although mother was nice to him during their monitored visits, in the past, she had gotten upset with him and hit him. The minor also expressed concern that mother did not listen to him and would rephrase his statements to something he did not mean.

The Department assessed the minor's risk of future harm as "high" if returned to mother's care. The Department summarized its findings this way: "Mother continues to not utilize her individual therapy, reporting everything is well and there are no concerns. Mother fails to take accountability [for] her actions or deal[ ] with the issues that brought the family to the attention of the Department. Up until now, there appears to be a great growth in [the minor]. He is able to function as any other

child his age. While he is mischievous and gets in trouble at school, he is confident, smart and understands a lot of what is going on around him. All these accomplishments would be negatively impacted if he were allowed to return [to] mother. Mother still demonstrates paranoid and accusatory behaviors towards people. Mother is not able to listen to her son and have an appropriate conversation with him. Mother attends individual therapy that should be used to address things that happened to her, but she is only attending; she is not learning anything since she is not open and sharing with her therapist. Mother's actions cause [the minor] to watch what he shares with her as he fears mother will lie about what he is saying. Mother does not have the appropriate skills necessary to be an appropriate parent. Mother's actions are likely to cause a deterioration of [the minor's] mental, emotional and social gains. [¶] Due to the aforementioned, it is the Department's assessment that Family Reunification Services be terminated and a .26 hearing be scheduled. Despite mother complying with Court ordered programs, mother has made little to no progress in dealing with the case issues that brought the family to the attention of [the Department]. Mother has completed programs, but there is no behavioral change that has come from the programs she has participated in and completed. Mother does not take any responsibility for her actions. At this time, mother is unable to provide the child with a safe and stable home."

At the hearing on January 24, 2023, the court found it would be detrimental to return the minor to mother's care. Specifically, the court noted that the reports and other information offered by the Department contained many instances of mother's failure to make progress with respect to the case plan.

15

Additionally, the court noted that the minor, who was then 11 years old, seemed to recognize that returning to mother's home might not be in his best interest at that time. In addition to the Department, minor's counsel also argued that reunification services should be terminated and the minor should not be returned to mother's custody.

The court found that mother's progress on her case plan was not substantial, that jurisdiction and suitable placement continued to be necessary, and that reunification services for mother should be terminated. The court found further that the Department had made reasonable efforts to return the minor to mother's home but that doing so would create a substantial risk of detriment to him. In sum, the court found that it was in the minor's best interest to set a hearing to select a permanent plan under section 366.26 and it set the date for the hearing on May 30, 2023.

## 8.    Writ Petition

Mother filed a petition for writ of mandamus on April 3, 2023. We issued an order to show cause staying the hearing under section 366.26. We also invited responsive briefs and received same from the Department and from the minor.

## DISCUSSION

Mother contends the court erred in finding that it would be detrimental to return the minor to her custody, that the Department provided reasonable reunification services, and that the beneficial parent-child relationship exception to adoption does not apply. As to the first two issues, we disagree. The third issue is not yet ripe for review.

### 1. Appellant's Burden on Appeal

"The juvenile court's judgment is presumed to be correct, and it is appellant's burden to affirmatively show error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

"An appellant must fairly set forth all the significant facts, not just those beneficial to the appellant. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)" (*In re S.C., supra*, 138 Cal.App.4th at p. 402.) Further, "[w]hen an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited. [Citations.]" (*Id.* at pp. 406–407.)

### 2. Governing Law and Standard of Review

"Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. (See *In re Matthew C.* (1993) 6 Cal.4th 386, 391; *In re Ethan C.* (2012) 54 Cal.4th 610, 624–626.) At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm. (Welf. & Inst. Code, § 300.) At the dispositional

stage, the court decides if the child can be returned to, or must be removed from, a parent's custody. (Welf. & Inst. Code, §§ 315, 319.) During the reunification stage, qualifying parents are offered services to address the causes that led to the loss of custody. (*Id.*, § 361.5, subd. (a).) Finally, if the child cannot be safely returned to the parent within a statutorily specified timeframe, the juvenile court proceeds to the permanency stage, where it either terminates parental rights and places the child up for adoption or it selects another permanent plan, such as placement with a guardian or in long-term foster care. (§ 366.26.) Throughout the proceedings, the juvenile court is instructed to pay careful attention to the well-being of the child, the efforts of the parent, and the services provided by the state to ensure that cases proceed to this final stage only when necessary. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 (*Cynthia D.*).)" (*Michael G., supra,* 14 Cal.5th at p. 624.)

This proceeding concerns the reunification stage. "The Legislature has determined the juvenile court may generally offer family reunification services for a maximum period of 18 months. (§§ 361.5, subd. (a)(3), 366.22, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) At the 18-month permanency review hearing the juvenile court must order a child returned to a parent's custody unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being. (§ 366.22, subd. (a).) 'That standard is construed as a fairly high one. [Citation.] It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as we might have hoped, or seemed less capable than the available foster parent or other family member.' (*M.G. v.*

18

*Superior Court* (2020) 46 Cal.App.5th 646, 660 (*M.G.*).) [¶] If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a).)

"We review the juvenile court's finding of detriment for substantial evidence. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252; *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Under that standard, we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 966; see *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.) However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' (*In re M.S.* (2019) 41 Cal.App.5th 568, 580; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding].)" (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864–865.)

3.  **Analysis**

    3.1.  **Mother fails to carry her burden to establish prejudicial error.**

Mother's petition is deficient. Specifically, mother fails to provide citations to the record to support factual assertions she makes in support of her legal arguments. She also presents only the evidence favorable to her, rather than discussing the entire record. For example, the opening brief states: "Here, [mother] took great care of the minor; and she participated in psychotherapy, had a psychological evaluation, had a medication evaluation, attended individual therapy, and completed two parenting classes." The brief goes on to list 15 specific facts supporting that contention—none of which includes a citation to the appellate record. Further, mother claims that "[she] attended every visit with her child and minimal concerns were noted." But as noted, *ante*, mother's conduct was inappropriate during visits with the minor on multiple occasions and those incidents caused the minor significant distress. Also, in discussing the Department's provision of reunification services, mother relies on legal authority concerning the type of effort that must be made with regard to an incarcerated parent. Mother was not incarcerated.

In short, mother fails to adhere to basic principles of appellate procedure and therefore fails to establish prejudicial error requiring a reversal of the court's order terminating reunification services and setting this matter for a permanency planning hearing under section 366.26. This deficiency notwithstanding, we briefly address mother's arguments on the merits.

20

### 3.2. Substantial evidence supports the court's detriment finding.

Properly framed,[6] the question before us is whether substantial evidence supports the court's finding that it would be detrimental to return the minor to mother's custody. We conclude that it does.

As noted, the juvenile court must order a child returned to a parent's custody at the 18-month permanency review hearing unless it finds, by a preponderance of the evidence, that return of the child will create a substantial risk of detriment to the child's safety, protection or physical or emotional well-being. (§ 366.22, subd. (a).) If the child is not returned to a parent at the permanency review hearing, the court must terminate reunification services and order a hearing pursuant to section 366.26. (§ 366.22, subd. (a); *Michael G., supra,* 14 Cal.5th at p. 624.)

The supplemental petition alleges that mother's untreated mental health issues created an unstable and unhealthy environment for the minor.[7] But mother claims "the only mental

---

[6] Mother asserts the court erred in retaining jurisdiction over the minor and that the Department failed to establish, by clear and convincing evidence, that removal was the only reasonable means to protect the minor. These arguments do not reflect the questions presented at the 18-month permanency review hearing. Construing mother's petition generously, we presume she intended to argue that no substantial evidence supports the court's finding that returning the minor to her care would be detrimental to his health, safety, or well-being.

[7] Although mother contends the court "erred when it retained jurisdiction over the minor due to [mother's] religious beliefs," neither

health issue reported for [mother] was related to [the Department] removing her child from her care, which is to be expected from any parent; and not cause to remove her child from her care." Mother fails to represent the record accurately. As described, *ante*, the record contains evidence that mother had been hospitalized and diagnosed with psychosis, not otherwise specified, and had a history of severe depression, including psychotic symptoms such as hallucinations and delusional thoughts. In addition, there are numerous examples of mother's irrational behavior (e.g., her belief that a witch in a schoolbook would lead to the minor's exposure to condoms, causing her to withdraw the minor from public school) and paranoid views (e.g., her baseless accusations of abuse by the minor's foster mother and bullying by the minor's schoolmates.)

Mother also contends that the Department failed to demonstrate that her mental health issues had any impact on the minor. She relies on *In re David M.* (2005) 134 Cal.App.4th 822, abrogated on another point by *In re R.T.* (2017) 3 Cal.5th 622, a case in which the Court of Appeal found that no substantial evidence supported jurisdiction under section 300, subdivision (b)(1), on account of mother's use of marijuana and both parents' mental illness. (*In re David M.*, at pp. 829–832.) There, the court noted, "[t]he record on appeal lacks any evidence of a specific, defined risk of harm to either David or A. resulting from mother's or father's mental illness, or mother's substance abuse." (*Id.*, at p. 830.) Mother notes that the appellate court concluded "[t]he evidence was uncontradicted that David was

the original nor the supplemental petition alleges jurisdiction on that basis.

22

healthy, well cared for, and loved, and that mother and father were raising him in a clean, tidy home. Whatever mother's and father's mental problems might be, there was no evidence those problems impacted their ability to provide a decent home for David." (*Ibid.*) Mother urges that the same is true in the present case.

As mother notes, a mental health diagnosis is insufficient, standing alone, to justify dependency jurisdiction. There must be some nexus between a parent's condition and some specific, defined risk of harm. (See *In re A.L.* (2017) 18 Cal.App.5th 1044, 1051 [mother's schizophrenia did not create substantial risk of physical harm to her children where incident in which she stopped taking her medication did not result in injury to the children, father acted quickly to obtain medical help, and mother had resumed taking her medication]; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 565 [mother's mental illness was not a sufficient justification for exercise of dependency jurisdiction where mother was able to provide appropriate care for her son]; *In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226 [" 'Harm to a child cannot be presumed from the mere fact the parent has a mental illness.' "].) Nonetheless, we reject mother's contention that her untreated mental health issues have not impacted the minor. As discussed, *ante*, when the Agency intervened in 2019, the minor was eight years old, and mother had totally isolated him from his family and children his own age. He had never attended school and lacked basic educational and social skills. During the proceedings below, mother repeatedly attempted to isolate the minor by withdrawing him from public school. Mother repeatedly, and baselessly, accused the foster mother of abusing the minor which caused the minor to become extremely upset, to regress in his

23

behaviors, and to act out in school and at home. Mother's behavior resulted in the termination of conjoint therapy sessions. And after mother falsely asserted that the minor was being bullied at school, the minor began to dwell on suicide while at school and regressed again, including with toileting issues. The minor's therapist concluded that the minor's contact with mother triggered stress reactions for him. This evidence, and other evidence contained in the appellate record, constitutes substantial evidence that returning the minor to mother's custody would be detrimental to the minor's physical and mental health and well-being.

### 3.3. Mother is not entitled to additional reunification services.

Mother contends the court erroneously found that the Department had provided reasonable reunification services during the 12- to 18-month period of supervision and, accordingly, that the order terminating those services and setting a hearing under section 366.26 must be reversed. We disagree.

Where, as here, a child is removed from his parent during a dependency proceeding, the juvenile court in most cases is required to "order the social worker"—here, the Department—to provide reunification services to the child and parent. (§ 361.5, subd. (a).) To implement this mandate, the court will identify the services that must be provided to the parent in a case plan. The court is required to hold periodic status review hearings to assess "[t]he extent of the" Department's "compliance with the case plan." (§§ 366, subd. (a)(1)(B), 366.21, subds. (e)(8) [six-month hearing], (f)(1)(A) [12-month hearing].) Under section 366.21, "[t]he court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing

24

evidence that reasonable services have been provided or offered to the parents or legal guardians.' (Welf. & Inst. Code, § 366.21, subd. (g)(4).) In other words, at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G., supra,* 14 Cal.5th at p. 625.)

Critically, however, the court here set the hearing under section 366.26 at the 18-month permanency review hearing. (§ 366.22.) The Supreme Court recently clarified one of the issues presented here, namely whether a parent who is denied reasonable services between the 12- and 18-month hearings is statutorily entitled to an automatic extension of services at the 18-month review hearing: "Unlike the statutory provisions governing the six- and 12-month hearings, the statutory provision governing the 18-month hearing contains no provision requiring the court to extend services if it concludes that reasonable services have not been offered or provided. (Compare § 366.22 [governing the 18-month hearing] with Welf. & Inst. Code, § 366.21, subds. (e)(3), (g) [governing the six- and 12-month hearings].) Rather, as a general rule, once a child has been out of a parent's custody for 18 months, the court must proceed to set a hearing to select a permanent plan for the child. (§ 366.22, subd. (a)(3).)" (*Michael G., supra,* 14 Cal.5th at p. 628.) The limited exceptions defined in section 366.22, subdivision (b), are not applicable here and mother does not argue otherwise.

In sum, even if mother could demonstrate that the Department failed to provide reasonable reunification services,

which does not appear to be the case, she would not be entitled to a reversal of the challenged order and an extension of services.

### 3.4.   Beneficial Parent-Child Exception to Adoption

Mother's final argument is that the court erred in not applying the beneficial parent-child exception to adoption. (§ 366.26, subd. (c)(1)(B)(i).) But this issue arises, if at all, at the permanency planning hearing under section 366.26. Because the court has not yet conducted that hearing, it has not yet considered whether the exception should apply. Mother's argument is therefore premature and not justiciable. (See, e.g., *Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1221 ["A claim is unripe for adjudication where there is not an actual controversy within the context of a sufficiently definite or concrete set of facts … . The ripeness requirement prevents courts from issuing purely advisory or hypothetical opinions."].)

## DISPOSITION

The petition for an extraordinary writ is denied.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.